Filed 9/15/21

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D077029 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS304526-02) |
| ALFRED LOPEZ-VINCK, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Roderick W. Shelton, Judge. Remanded for correction of minute order and abstract of judgment; judgment affirmed.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael P. Pulos and Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II and III.A–D.

## I.

## INTRODUCTION

Defendant Alfred Lopez-Vinck appeals from a judgment entered after a jury convicted him of three counts of robbery and three counts of assault with a deadly weapon. Lopez-Vinck and his girlfriend and co-defendant Misty Lynn Probert were both convicted of charges arising from an incident in which Probert shoplifted various items from a Kohl's store. After Probert exited the store and was approached by three loss prevention officers, Lopez-Vinck, got out of his vehicle, took out a knife, pointed it in the direction of the loss prevention officers, and moved toward them while aggressively yelling at them to back up. Probert walked past the loss prevention officers while still in possession of the stolen merchandise, got into Lopez-Vinck's car, and the two drove off together.

On appeal, Lopez-Vinck contends that there is insufficient evidence to support his convictions for assault with a deadly weapon, arguing that he did not engage in any act that was likely to cause injury and he did not have the present ability to injure anyone.[1]

Lopez-Vinck also argues that his convictions for assault with a deadly weapon must be modified to convictions for the lesser offense of brandishing because, he asserts, brandishing is a more specific statute that applies to his conduct and preempts the assault statute.

In addition, Lopez-Vinck contends that the trial court erred, and violated his right to due process, by imposing various fines and fees without

---

[1]     Probert was tried jointly with Lopez-Vinck and was convicted of three counts of robbery. Probert separately appealed from the judgment, and this court affirmed. (See *People v. Probert* (Oct. 15, 2020, D075716) [nonpub. opn.].)

first finding that he had the ability to pay them. Finally, he asserts that the minute order and abstract of judgment must be corrected to reflect the court's oral pronouncement with respect to striking his prison prior.

We conclude that only Lopez-Vinck's final contention has merit. We therefore remand for the trial court to correct the minute order and abstract of judgment to reflect that the court struck Lopez-Vinck's prison prior. We also conclude that a recent ameliorative amendment to the law entitles Lopez-Vinck to have vacated any portion of the fee imposed pursuant to Government Code section 29550.1 that remained unpaid as of July 1, 2021. We therefore vacate the unpaid balance of this fee, and otherwise affirm the judgment as modified.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*

1. *The prosecution*

On the afternoon of September 21, 2018, Probert entered a Kohl's department store. Kohl's loss prevention officer Lisa H. noticed Probert exhibiting behavior consistent with shoplifting, so she began to monitor Probert as she walked through the store. Lisa H. observed Probert walk to the juniors' department, quickly grab five pairs of jeans without looking at the prices, enter a fitting room and emerge a few minutes later holding only her purse and one pair of jeans. Lisa H. communicated with another loss prevention officer, Jenny R., regarding Probert. When Jenny R. checked the fitting room that Probert had used, she found that three, not four, pairs of jeans had been left there. After Probert left the fitting room area, she went to the girls' department, where she took a decorative bow and clipped it onto her jacket. While in the girls' department, Probert put a pair of children's green

3

shorts inside her purse; at some point, she picked up a pair of pink shorts, which she added to items that she was holding in her hands.

Probert eventually headed toward the store's registers. She walked up to a register and paid for the pair of pink shorts. She did not pay for the bow that she had affixed to her jacket, nor did she pay for the items that she had concealed in her purse.

As soon as Probert walked out of the store, three loss prevention officers approached her. Loss prevention officer Hector H. introduced himself, showed Probert his employee badge, and informed her that he " 'work[s] for Kohl's loss prevention.' " He told Probert that he wanted to talk to her inside the loss prevention office in the store. Probert was "dismiss[ive]" of the loss prevention officers and tried to continue walking past them while they were talking to her. The loss prevention officers had arranged themselves in such a way as to create a "human barrier" in an attempt to prevent Probert from passing them, and requested that Probert give them the items that she had taken from the store. They did not threaten, raise their voices at, or make any physical contact with Probert.

Lopez-Vinck had pulled up in his car in front of the store, and jumped out of the car when the loss prevention officers confronted Probert. He was holding a pocketknife that had a three-inch blade exposed. Lopez-Vinck walked toward the loss prevention officers. He appeared "very aggressive" and yelled, " 'Back the fuck up.' " Lopez-Vinck was holding the knife with one hand. The knife blade was pointed in the general direction of the loss prevention officers. Lopez-Vinck moved toward the loss prevention officers. The loss prevention officers estimated that Lopez-Vinck came within about 6 to 15 feet of them. The loss prevention officers, who had been standing between Probert and Lopez-Vinck's car, immediately moved out of Probert's

4

way in fear.  Probert made her way directly to Lopez-Vinck's car and said nothing.  As Probert was walking to the car, the loss prevention officers asked her to "[a]t least give us our stuff back."  Probert continued to ignore the loss prevention officers, and got into the car while still in possession of the stolen items.  Lopez-Vinck did not say anything to Probert as he held the knife and Probert walked past him.

After Probert got into the car, Lopez-Vinck remained outside the car for another 30 seconds, "puff[ing] his chest" and yelling at the loss prevention officers, still holding the knife in his hand but backing up slightly.  Hector said to Lopez-Vinck, "[I]t's just merchandise . . . [s]he should just give it back. [¶] . . . [¶] . . . [I]t's not that serious . . . it doesn't have to be like that.  If you could just cooperate."  Hector asked Lopez-Vinck, "Why make it a big deal?"  Lopez-Vinck got back into his car and drove off with Probert and the stolen merchandise.

2.  *The defense case*

Lopez-Vinck testified in his own defense.  According to Lopez-Vinck, he had no idea that Probert had stolen anything from the store; rather, he said that he believed that the loss prevention officers, who were dressed in plainclothes, were trying to mug Probert as she exited the store.

Lopez-Vinck testified that, on the day these events took place, he and Probert had stopped at Kohl's to buy a change of clothes for their young daughter, who had wet herself in her car seat.  Probert went inside the store, and Lopez-Vinck stayed in the car with their daughter.  After about 30 minutes, Lopez-Vinck pulled out of his parking spot and drove toward the front entrance to the store.  Lopez-Vinck said that he had assumed that Probert would be coming out of the store at around that time.  He waited for her in front of the store with the car running.

5

Lopez-Vinck testified that a few minutes after he drove to the front of the store, Probert walked out of the store and was immediately confronted by two individuals, one male and one female, who were dressed in black. The pair blocked Probert's path. Lopez-Vinck said that he saw "the boy" reach for the Kohl's bag that Probert was holding. A third individual "came out of nowhere" and blocked Lopez-Vinck's view of Probert. Lopez-Vinck testified that he thought that Probert was being mugged. He grabbed his pocketknife from the compartment in the passenger side door and got out of the car. Lopez-Vinck approached the individuals who were standing between Probert and the vehicle and told them to " '[b]ack the fuck up' " while he held the knife "up in the air." The individuals backed away at that point.

As soon as the individuals scattered, Probert walked to the car and got in while Lopez-Vinck remained outside of the car for another 30 seconds, yelling at the individuals because they "were still coming toward [him]." Lopez-Vinck acknowledged that he did not call 911 during the incident.

Once Lopez-Vinck returned to the car and he and Probert began driving away, he asked Probert who those people were and what they were talking about. According to Lopez-Vinck, Probert told him that those individuals worked for Kohl's and thought that she had stolen something from the store. Probert denied having stolen anything. Lopez-Vinck said that he stopped the car and had Probert empty her purse, pockets, and the Kohl's bag to prove to him that she had not stolen anything. Lopez-Vinck testified that Probert showed him the receipt for the pink shorts, and that he did not see any stolen items.

Lopez-Vinck testified that he did not learn that Probert had actually shoplifted merchandise from Kohl's until he was interviewed by a detective weeks after the incident. During that interview, after being told that Probert

6

had in fact shoplifted some items, Lopez-Vinck told the detective that he had forced Probert to go into the store by holding a gun to her head and threatening to cut her throat if she did not go inside. At trial, Lopez-Vinck claimed that he had not actually threatened Probert, despite what he had told the detective, and indicated that he had lied to the detective in order to protect Probert.

B. *Procedural background*

The San Diego District Attorney charged both Probert and Lopez-Vinck with three counts of robbery (Pen. Code,[2] § 211; counts 1–3), and also charged Lopez-Vinck with three counts of assault with a deadly weapon (§ 245, subd. (a)(1); counts 4–6). With respect to the robbery counts, the information alleged that Lopez-Vinck personally used a deadly and dangerous weapon—a knife— in the commission of the offenses.[3] The information also alleged that Lopez-Vinck had suffered two prior felony convictions (§ 1203, subd. (e)(4)) and one prison prior (§§ 667.5, subd. (b), 668).

After a joint trial, a jury found Lopez-Vinck guilty on all of the charges, and found true all of the related personal use enhancement allegations. Lopez-Vinck admitted that he had two prior felony convictions and a prison prior.

---

[2]    Further statutory references are to the Penal Code unless otherwise indicated.

[3]    The information also included a personal use of a deadly weapon allegation in connection with count 6, one of the assault counts. However, that allegation was dismissed and the jury was not asked to determine the truth of that allegation.

At sentencing, the trial court sentenced Lopez-Vinck to three years in state prison. Lopez-Vinck filed a notice of appeal, which this court deemed timely.

III.

DISCUSSION

A. *Substantial evidence supports Lopez-Vinck's convictions for assault with a deadly weapon*

Lopez-Vinck contends that there is insufficient evidence to support a finding that his conduct satisfied all of the elements of the offense of assault with a deadly weapon. Specifically, Lopez-Vinck claims that he did not commit an act that would directly and probably cause injury, and he further contends that, given the distance between him and the loss prevention officers, he lacked the present ability to inflict injury on any of them.

"The crime of assault with a deadly weapon has two components: '(1) the assault, and (2) the means by which the assault is committed.' " (*In re Raymundo M.* (2020) 52 Cal.App.5th 78, 85 (*Raymundo M.*).) "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) To commit an assault, the defendant must attempt an act that, if successful, " 'will probably and directly result in injury to another.' " (*People v. Wyatt* (2010) 48 Cal.4th 776, 780 (*Wyatt*).) The attempted act must be coupled with a present ability to commit a violent injury, that is, the defendant must have " 'attained the means and location to strike immediately.' " (*People v. Chance* (2008) 44 Cal.4th 1164, 1168 (*Chance*).) "In this context, however, 'immediately' does not mean 'instantaneously.' It simply means that the defendant must have the ability to inflict injury on the present occasion." (*Ibid.*, fn. omitted.) Thus, immediacy means that the defendant has "equip[ped] and position[ed]

8

himself to carry out a battery . . . , even if some steps remain to be taken, and even if the victim or the surrounding circumstances thwart the infliction of injury." (*Id.* at p. 1172.) "Numerous California cases establish that an assault may be committed even if the defendant is several steps away from actually inflicting injury, or if the victim is in a protected position so that injury would not be 'immediate,' in the strictest sense of that term." (*Id.* at p. 1168.) Finally, "[a]s used in section 245, subdivision (a)(1), a 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' " (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028–1029 (*Aguilar*).)

Lopez-Vinck contends that the evidence is insufficient to support his conviction for assault with a deadly weapon because he did not commit any act likely to inflict injury on the loss prevention officers and because he lacked the present ability to commit an injury, given that he was several feet away from them. "In determining whether the evidence is sufficient to support a conviction . . . , 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] Under this standard, 'an appellate court in a criminal case . . . does not ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Rather, the reviewing court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence— that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1224, italics omitted.)

With respect to Lopez-Vinck's contention that the evidence does not support a finding that he engaged in an act that was likely to result in injury, viewing the evidence in the light most favorable to the verdict, the evidence demonstrates that Lopez-Vinck displayed a knife with an exposed blade while he was within six to fifteen feet of the three loss prevention officers. Lopez-Vinck raised the knife to shoulder or head height with the blade pointing toward the loss prevention officers, assumed an aggressive posture and yelled at the loss prevention officers to " '[b]ack the fuck up.' " He was moving toward the loss prevention officers while holding the knife in this manner. As Lopez-Vinck approached the loss prevention officers, they backed away in fear. This evidence demonstrates that Lopez-Vinck was signaling that he was ready to, and could, strike at the loss prevention officers, and is sufficient to support the jury's finding that Lopez-Vinck engaged in an act that, if it had been successful, would " 'probably and directly result in injury to another.' " (*Wyatt, supra*, 48 Cal.4th at p. 780.)

These factual circumstances are similar to the facts in *People v. Yslas* (1865) 27 Cal. 630 (*Yslas*). In *Yslas*, the defendant approached to within seven or eight feet of the victim with a raised hatchet in his hand. The victim escaped any injury by running to the next room and locking the door. (*Id*. at p. 631.) As the Supreme Court has noted, the defendant in *Yslas* "committed assault, *even though he never closed the distance between himself and the victim, or swung the hatchet*." (*Chance, supra*, 44 Cal.4th at p. 1174, citing *Yslas, supra*, 27 Cal. at pp. 631, 633–634, italics added.) In this case, although Lopez-Vinck did not reach any of the loss prevention officers, he moved toward them, knife raised, and, viewing the evidence in the light most favorable to the verdict, came within six feet of them; they retreated in order to escape him. This is sufficient to support a finding that Lopez-Vinck

10

committed an assault.  (See, e.g., *Chance, supra*, at p. 1168 ["[A]n assault may be committed even if the defendant is several steps away from actually inflicting injury"]; *Aguilar, supra*, 16 Cal.4th at p. 1028 ["One may commit an assault without making actual physical contact with the person of the victim"]; *Raymundo M., supra*, 52 Cal.App.5th at pp. 82–83, 87–88 [juvenile's act of lunging and running toward the victim from 10 to 12 feet away, rather than "merely brandish[ing] the knife while standing still," supported reasonable finding that the juvenile "actually used the knife in a way capable of producing, and likely to produce, death or great bodily injury"].)

The sufficiency of the evidence is not undermined by the fact that the testimony did not establish that Lopez-Vinck "swung, jabbed, or deployed the knife in any way," as Lopez-Vinck contends.  The juvenile in *Raymundo M.* made a similar argument for reversal of the true finding that he had committed an assault with a deadly weapon.  (*Raymundo M., supra*, 52 Cal.App.5th at p. 89.)  The *Raymundo* court explained, "[C]ourts have held that an assault with a deadly weapon can occur even when the defendant never swings the weapon."  (*Ibid.*, citing *Yslas, supra*, 27 Cal. at pp. 631, 633–634; *Chance, supra*, 44 Cal.4th at p. 1174; *People v. Bernal* (2019) 42 Cal.App.5th 1160, 1168 [affirming conviction for assault with a deadly weapon where the defendant held up a knife to the victim and asked, " 'Do you want to do this?' "].)

This same evidence constitutes substantial evidence that Lopez-Vinck had the *present* ability to cause injury.  After emerging from the car, Lopez-Vinck started to close the distance between himself and the loss prevention officers, walking toward them in a menacing manner and coming as close as six feet from them.  Again, the "present ability" element "is satisfied when 'a defendant has attained the means and location to strike immediately' " and

11

for this purpose, " 'immediately' . . . simply means that the defendant must have the ability to inflict injury on the present occasion." (*Chance, supra,* 44 Cal.4th at p. 1168.) Thus, "present ability" may exist "even if the defendant is several steps away from actually inflicting injury, or if the victim is in a protected position so that injury would not be 'immediate,' in the strictest sense of that term." (*Ibid*.) The fact that the loss prevention officers backed away from Lopez-Vinck, and thereby maintained some distance between themselves and him, does not mean that Lopez-Vinck lacked the present ability to cause injury. (See, e.g. *In re B.M.* (2018) 6 Cal.5th 528, 537 ["[A]n aggressor should not receive the benefit of a potential victim fortuitously taking a defensive measure or being removed from harm's way once an assault is already underway"].)

In sum, the jurors could have reasonably concluded that Lopez-Vinck's conduct in raising a knife in a striking position, approaching the victims with the knife pointed toward them, and yelling at them to "back the fuck up" while maintaining an aggressive stance and closing the distance between them, causing the victims to back away to escape his approach, constituted the commission of an assault with a deadly weapon.

B. *The* Williamson *rule does not require that Lopez-Vinck's assault convictions be modified to the lesser offense of brandishing*

Lopez-Vinck contends that, in the event that this court rejects his sufficiency of the evidence argument, his assault with a deadly weapon convictions must nonetheless be reversed and modified to the misdemeanor offense of brandishing a deadly weapon. Lopez-Vinck claims that the conduct constituting the offense of assault with a deadly weapon is prohibited under the more "specific" offense of brandishing, which carries a less severe penalty, and that the brandishing statute therefore controls. Lopez-Vinck's argument

12

is "premised on a doctrine often referred to as the *Williamson* rule, based on [the Supreme Court's] decision in *In re Williamson* (1954) 43 Cal.2d 651, 654 (*Williamson*). Under the *Williamson* rule, if a general statute includes the same conduct as a special statute, the court infers that the Legislature intended that conduct to be prosecuted exclusively under the special statute. In effect, the special statute is interpreted as creating an exception to the general statute for conduct that otherwise could be prosecuted under either statute." (*People v. Murphy* (2011) 52 Cal.4th 81, 86.) "[T]he *Williamson* preemption rule is applicable (1) when each element of the general statute corresponds to an element on the face of the special statute, or (2) when it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute." (*People v. Watson* (1981) 30 Cal.3d 290, 295–296 (*Watson*).) It is clear that the *Williamson* rule does not apply when "a felony statute requires a more culpable mental state than a misdemeanor statute proscribing the same behavior." (*Hudson v. Superior Court* (2017) 7 Cal.App.5th 999, 1007.)

"In *Williamson*, for example, the defendant was convicted under the general conspiracy statute, Penal Code section 182, of conspiring to commit the crime of contracting without a license in violation of section 7028 of the Business and Professions Code. A violation of Penal Code section 182 was punishable as either a misdemeanor or a felony. The defendant argued that his conduct was punishable only under a special statute, Business and Professions Code former section 7030 [citation], which made it a misdemeanor to 'conspire[ ] with another person to violate any of the provisions of this chapter.' Th[e Supreme Court] agreed. [The Supreme Court] explained, 'To conclude that the punishment for the violation of section 7030 of the Business and Professions Code is stated in section 182 of

13

the Penal Code, which deals with conspiracies in general, would be inconsistent with the designation of the particular conspiracy as a misdemeanor.' (*Williamson, supra*, 43 Cal.2d at p. 655; see also *People v. Gilbert, supra*, 1 Cal.3d at p. 481 [prosecution for theft barred by special statute prohibiting use of false statement to obtain welfare, because 'any conduct which violated [the welfare fraud statute] would also constitute a violation of the theft provision of the Penal Code'].)" (*People v. Murphy* (2011) 52 Cal.4th 81, 86–87.)

Setting aside the open question of whether a challenge made pursuant to *Williamson* may be forfeited given Lopez-Vinck's failure to raise this issue in the trial court, we conclude that Lopez-Vinck's contention fails on its merits.[4] With respect to the question whether the elements of the "general statute" correspond to the elements of the "special statute" (*Watson, supra*, 30 Cal.3d at pp. 295–296), we conclude that they do not. Lopez-Vinck contends that the "general statute" in this situation is section 245, subdivision (a), the statute outlining the offense of assault with a deadly weapon, while the "special statute" is section 417, the statute outlining the offense of brandishing. Section 245, subdivision (a) prohibits an "assault upon the person of another with a deadly weapon or instrument other than a firearm." As we have noted, an "assault" is defined as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) Section 417, subdivision (a) provides that "[e]very person who, except in self-defense, in the presence of any other person, draws or exhibits any deadly weapon whatsoever, other than a firearm, in a rude,

---

4      The People assert that this contention has been forfeited, but concede that there remains an open question whether a challenge based on the *Williamson* rule can be forfeited.

14

angry, or threatening manner, or who in any manner, unlawfully uses a deadly weapon other than a firearm in any fight or quarrel is guilty of a misdemeanor . . . ." It is clear from an examination of the elements of these two offenses that their elements do not correspond. (See *People v. Escarcega* (1974) 43 Cal.App.3d 391, 398 ["Obviously an assault with a deadly weapon may be perpetrated without drawing or exhibiting [the deadly weapon] in a rude, angry, or threatening manner, or using it in a fight or quarrel"]; see also *People v. Torres* (1957) 151 Cal.App.2d 542, 544–545 ["An assault with a deadly weapon can be committed without violating any provision of Penal Code, section 417, as by firing a gun through a coat pocket without either drawing or exhibiting the weapon and without then being engaged in a fight or quarrel"].)

With respect to the second test—i.e., whether "it appears from the statutory context that a violation of the special statute will necessarily or commonly result in a violation of the general statute" (*Watson, supra*, 30 Cal.3d at pp. 295–296)—we conclude that this test also is not met. Again, the question is whether, if one commits a brandishing, that individual will necessarily or commonly also violate Penal Code section 245. We cannot say that the commission of a brandishing will necessarily or commonly result in an assault with a deadly weapon. Brandishing and assault with a deadly weapon are two different offenses, with different elements that overlap only in certain situations. There are numerous possible scenarios in which a person could exhibit a deadly weapon in a rude or threatening manner without also attempting to commit a violent injury on another person with the weapon while having the present ability to inflict injury. We therefore reject Lopez-Vinck's contention that his conviction for assault with a deadly weapon, which was based on evidence demonstrating that he aggressively

15

moved toward the loss prevention officers, holding a knife in his hand and pointing it at the victims while also verbally threatening them, must be reduced to a conviction for mere brandishing.  The Legislature did not intend such conduct to be prosecuted exclusively under Penal Code section 417; we will therefore not modify Lopez-Vinck's convictions for felony assault with a deadly weapon to misdemeanor brandishing.

C.  *Fines and fees*

Lopez-Vinck contends that the trial court violated his federal and state constitutional rights by imposing various fines and fees without first determining, under the authority announced in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), that Lopez-Vinck had the ability to pay those fines and fees.

1.  *Additional background*

At the sentencing hearing, which occurred on March 7, 2019, the court imposed a $2,000 restitution fine under Penal Code section 1202.4, subdivision (b), a $2,000 parole revocation fine under Penal Code section 1202.45, a $240 court operations assessment under Penal Code section 1465.8, a $180 criminal conviction assessment under Government Code section 70373, a $154 criminal justice administration fee under former Government Code section 29550.1, a $39 theft fine under Penal Code section 1202.5, and $72.99 in victim restitution to Kohl's pursuant to Penal Code section 1202.4, subdivision (f).  The court made no determination that Lopez-Vinck had the ability to pay these fines and fees, and Lopez-Vinck did not request that such a finding be made.

At the time of sentencing, Lopez-Vinck was 28 years old.  The probation report indicates that Lopez-Vinck graduated from high school in 2006 while incarcerated in a California Youth Authority facility.  He has since been

employed at warehouses, in sales, and at fast food restaurants. Lopez-Vinck denied having assets or debts; prior to his arrest, he was receiving $300 per month in general relief and $200 per month in food stamps. The probation report does not identify any condition that would prohibit Lopez-Vinck from working.

2. *This contention has been forfeited*

Preliminarily, the People argue that Lopez-Vinck has forfeited his claim of error because his sentencing hearing took place on March 7, 2019, which was after the opinion in *Dueñas* was issued in January 2019.

We agree that Lopez-Vinck has forfeited his contention under *Dueñas*. In general, a defendant who fails to object to the imposition of fines, fees, and assessments at sentencing forfeits the right to challenge those fines, fees, and assessments on appeal. (See, e.g., *People v. Aguilar* (2015) 60 Cal.4th 862, 864; *People v. Trujillo* (2015) 60 Cal.4th 850, 853–854; see also *People v. Bipialaka* (2019) 34 Cal.App.5th 455, 464; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1155.) This is particularly so in a case such as this one, where the sentencing occurred *after* the *Dueñas* court declared a constitutional right to have a court determine the defendant's ability to pay before imposing statutorily mandated fines and assessments. In addition, because the $2,000 restitution fine imposed by the trial court exceeded the $300 statutory minimum, Lopez-Vinck had the opportunity to object and argue that he was unable to pay it, but he did not do so, notwithstanding established statutory authorization for raising such a challenge (§ 1202.4, subd. (d)).[5] By failing to raise the issue of his inability to pay the $2,000

---

5      Section 1202.4, subdivision (d) provides that the court "shall consider any relevant factors, including, but not limited to, the defendant's inability to

17

restitution fine, Lopez-Vinck forfeited any claim that the court violated his constitutional rights by imposing that fine, as well as the other fines and fees imposed by the court, without considering his ability to pay. (See *People v. Miracle* (2018) 6 Cal.5th 318, 356 [defendant forfeited challenge to restitution fine which exceeded statutory minimum by failing to object at sentencing]; see also *People v. Jenkins* (2019) 40 Cal.App.5th 30, 40–41 [defendant had a statutory right to object to imposing of $9,700 of $10,000, and his failure to do so resulted in forfeiture of his claim under *Dueñas* that all of the assessments and fees imposed without an ability to pay hearing violated his right to due process].)

Because Lopez-Vinck failed to raise the issue of his ability to pay in the trial court, he is precluded from raising an appellate challenge to the trial court's imposition of fines, fees or assessments without an ability to pay hearing.

### 3. *Ineffective assistance*

Lopez-Vinck contends in the alternative that if this court concludes that he has forfeited his claim that the trial court erred in imposing the challenged fines and fees without determining his ability to pay them, then his trial counsel rendered ineffective assistance in failing to assert an objection on this ground.

" 'The law governing [an ineffective assistance of counsel] claim is settled. "A criminal defendant is guaranteed the right to the assistance of counsel by both the state and federal Constitutions. [Citations.] 'Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance.' " [Citations.] It is defendant's

---

pay," in setting a fine in excess of $300, which is the minimum fine amount set in subdivision (b)(1) of the provision.

burden to demonstrate the inadequacy of trial counsel.  [Citation.]  We have summarized defendant's burden as follows:  " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms."  [Citations.]  Second, [a defendant] must also show prejudice flowing from counsel's performance or lack thereof.  [Citation.]  Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' "  [Citation.]' "  (*People v. Vines* (2011) 51 Cal.4th 830, 875–876 (*Vines*), overruled on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 104.)

" 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  [Citation.]  Defendant's burden is difficult to carry on direct appeal, as we have observed:  " 'Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission.' "  [Citation.]' [Citation.]  If the record on appeal ' " 'sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected," ' and the 'claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding.' "  (*Vines, supra*, 51 Cal.4th at p. 876.)

19

Lopez-Vinck has not met his burden to demonstrate either that his trial counsel's performance was deficient, or that there is a reasonable probability that, but for counsel's failure to object to the court's failure to conduct an ability to pay inquiry, the result would have been different. As to the first point, the record does not reveal why defense counsel failed to request an ability to pay determination. As a result, " ' " 'unless there simply could be no satisfactory explanation' " ' " for counsel's failure to act (*Vines, supra*, 51 Cal.4th at p. 876), we must reject Lopez-Vinck's ineffective assistance of counsel claim. In this case, counsel could have reasonably concluded that, given this record, an ability to pay hearing would not have altered the court's decision with respect to the fines and fees imposed. Specifically, the record demonstrates that Lopez-Vinck has an ability to pay the fines and fees imposed, based on his past income-earning capacity and financial means, as well as his ability to earn prison wages during his sentence. (See *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1076 [" ' "Ability to pay does not necessarily require existing employment or cash on hand." [Citation.] "[I]n determining whether a defendant has the ability to pay a restitution fine, the court is not limited to considering a defendant's *present* ability but may consider a defendant's ability to pay in the future." [Citation.] This include[s] the defendant's ability to obtain prison wages' "].)

The fact that there is evidence that Lopez-Vinck does have an ability to pay the imposed fines and fees also prevents Lopez-Vinck from being able to make the requisite showing of prejudice for purposes of an ineffective assistance of counsel claim. In essence, because there is evidence that Lopez-Vinck has an ability to pay the fines and fees, there is no reasonable probability that, but for counsel's failure to request an ability to pay hearing, the trial court would have imposed fines and fees in a lesser amount. (See

20

*People v. Johnson* (2019) 35 Cal.App.5th 134 [any error in imposing fines and fees without an ability to pay hearing was harmless because record showed that defendant had some financial means and past income-earning capacity, as well as an ability to earn prison wages]; see also *People v. Jones* (2019) 36 Cal.App.5th 1028, 1035–1036 [same].)

D. *The minute order and abstract of judgment must be corrected to align with the trial court's oral pronouncement of judgment and current law*

Lopez-Vinck argues that the minute order from the sentencing hearing and the abstract of judgment must be corrected to reflect the trial court's oral pronouncement at sentencing that it would not impose a one-year prison prior.[6] The People agree with this contention, acknowledging that the court indicated its intention not to impose a sentence with respect to Lopez-Vinck's prison prior when the court stated, "And the Court will not impose the prison prior one year, also." The People also concede that under a recent amendment to Penal Code section 667.5, subdivision (b), which became effective on January 1, 2020, one-year prison priors may not be imposed unless the prior offense was a sexually violent offense as defined in section 6600 of the Welfare and Institutions Code, and that this ameliorative statutory amendment applies to nonfinal cases such as this one, where the defendant's prior offense was not a sexually violence offense. The People agree that the minute order from the sentencing hearing date, as well as the abstract of judgment, both of which refer to the imposition and staying of a

_____

6    The minute order from the March 7, 2019 sentencing hearing includes a reference to the one-year prison prior, and below the reference includes the following typewritten notation:  "1st Prison Prior as indicated above is stayed per the Court."  The abstract of judgment includes in the section titled "3. Enhancements" (capitalization omitted) a reference to the one-year prison prior, and indicates that the prison prior has been stayed.

one-year prison prior enhancement, should be corrected to reflect the court's oral pronouncement of sentence, which included striking the one-year prison prior enhancement.

We agree with the parties that the minute order and abstract of judgment must be corrected to reflect the striking—rather than the imposition and staying—of the one-year prison prior enhancement. We will therefore remand to the trial court with directions to correct both documents in this regard. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 188 [appellate court may direct trial court to correct minute order and abstract of judgment].)

E. *Any portion of the criminal justice administration fee imposed that remained unpaid as of July 1, 2021 must be vacated*

As of July 1, 2021, the statutory provision pursuant to which the court ordered Lopez-Vinck to pay a $154 criminal justice administration fee was repealed (see former Government Code section 29550.1 (section 29550.1)), and newly-enacted Government Code section 6111 (section 6111) became effective.[7] Section 6111 provides:

> "(a) On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to Section 27712, subdivision (c) or (f) of Section 29550, and Sections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated.

> "(b) This section shall become operative on July 1, 2021."

---

[7] These changes were enacted as a result of the Governor signing Assembly Bill No. 1869 into law. Effective July 1, 2021, Assembly Bill No. 1869 eliminates many fines, fees, and assessments that courts have imposed under a variety of statutes. (Assem. Bill No. 1869 (2019–2020 Reg. Sess.) §§ 2, 62.)

Because this change in the law became effective well after the parties had submitted their briefs in this matter, we requested that the parties provide supplemental briefing on the question of the effect of the repeal of section 29550.1 on this pending appeal. In response to our supplemental briefing request, Lopez-Vinck argues that under the authority of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), Assembly Bill No. 1869's repeal of section 29550.1 entitles him to have the "portion of the judgment imposing [the $154 fee under section 29550.1] vacated." The People argue that this court need not do anything in response to the change in the law because, "under the bill's plain language and California Supreme Court precedent, the fee automatically became uncollectible starting July 1, 2021, without the involvement of the courts." The People assert that "the fee was enforceable and collectible until June 30, after which date appellant was automatically entitled to relief." The People therefore contend that this court should affirm the judgment with respect to the criminal justice administration fee.

The issue raised by the enactment of Assembly Bill No. 1869 requires that we consider whether, and to what extent, the Legislature intended the new statutory scheme to apply to individuals whose nonfinal judgments include the imposition of fees that were repealed after sentence was imposed. Because these questions involve interpretation of a legislative enactment involving the repeal of one relevant provision (section 29550.1) as well as the addition of a new provision (section 6111), we rely on certain general rules governing statutory interpretation. A reviewing court's construction of a statute is " 'guided by the overarching principle that [its] task " 'is to determine the intent of the enacting body so that the law may receive the interpretation that best effectuates that intent.' " ' " (*In re R.V.* (2015)

23

61 Cal.4th 181, 192.)  First among the principles of statutory interpretation is honoring " ' "the language of the statute" ' " as " 'construed in the context of the statute as a whole and the overall statutory scheme.' " (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 901.)  If the language of the statute is ambiguous, a court "can look to legislative history [citation] and to rules or maxims of construction" to resolve the ambiguity.  (*People v. Smith* (2004) 32 Cal.4th 792, 798.)  Further, any ambiguities in a statute "are not interpreted in the defendant's favor if such an interpretation would provide . . . a result inconsistent with apparent legislative intent."  (*People v. Cruz* (1996) 13 Cal.4th 764, 783.)

In *Estrada*, the Supreme Court "considered the retroactive application of a statutory amendment that reduced the punishment prescribed for the offense of escape without force or violence."  (*People v. Conley* (2016) 63 Cal.4th 646, 656 (*Conley*).)  The *Conley* court summarized the rule set out in *Estrada* as follows:

> " 'The problem,' we explained, 'is one of trying to ascertain the legislative intent—did the Legislature intend the old or new statute to apply?  Had the Legislature expressly stated which statute should apply, its determination, either way, would have been legal and constitutional.' [Citation.]  But *in the absence of any textual indication of the Legislature's intent*, we inferred that the Legislature must have intended for the new penalties, rather than the old, to apply.  [Citation]  We reasoned that when the Legislature determines that a lesser punishment suffices for a criminal act, there is ordinarily no reason to continue imposing the more severe penalty, beyond simply ' "satisfy[ing] a desire for vengeance." ' [Citation.]  Thus, we concluded, '[i]t is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply,' including 'to

24

acts committed before its passage[,] provided the judgment convicting the defendant of the act is not final.' [Citation]" (*Conley, supra*, 63 Cal.4th at p. 656, italics added.)

The *Estrada* rule, therefore, "rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not." (*Conley, supra*, 63 Cal.4th at p. 657.) It is clear, however, that "the *Estrada* rule reflects *a presumption* about legislative intent, rather than a constitutional command," and, therefore, "the Legislature (or . . . electorate) may choose to modify, limit, or entirely forbid the retroactive application of ameliorative criminal law amendments if it so chooses." (*Conley, supra*, at p. 656, italics added.)

The voter enactment at issue in *Conley*, unlike the statute in *Estrada*, was "*not* silent on the question of retroactivity." (*Conley, supra*, 63 Cal.4th at p. 657, italics added.) "Rather, the Act expressly addresses the question [of retroactivity] in section 1170.126, the sole purpose of which is to extend the benefits of the Act retroactively." (*Ibid*.) The *Conley* court noted that, "[b]y its terms, the provision [addressing retroactivity] draws no distinction between persons serving final sentences and those serving nonfinal sentences, entitling both categories of prisoners to petition courts for recall of sentence under the Act." (*Ibid*.)

Assembly Bill No. 1869, like the enactment at issue in *Conley*, reflects a legislative intent to address retroactive application of its terms. Specifically, Assembly Bill No. 1869, through the enactment of section 6111, distinguishes between fees paid by convicted individuals pursuant to fee orders made under the repealed fee statutes *prior* to July 1, 2021, and those fees that *remain*

25

*outstanding* as of July 1, 2021. Assembly Bill No. 1869 makes the legislative intent clear, stating: "It is the intent of the Legislature to eliminate the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system and *to eliminate all outstanding debt incurred as a result of the imposition of administrative fees*." (Assem. Bill No. 1869 (2019–2020 Reg. Sess.) § 2, italics added.) In order to eliminate the "outstanding debt incurred" by defendants as a result of the imposition of the repealed fee provisions, the Legislature enacted section 6111, which provides in relevant part: *"On and after July 1, 2021, the unpaid balance of any court-imposed costs* pursuant to . . . Section 29550, and Sections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, *is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated.*" (§ 6111, subd. (a), italics added.) By specifying the precise date on which the costs that have been imposed on defendants pursuant to "Section 29550, and Sections 29550.1, 29550.2, and 29550.3," become unenforceable and uncollectible, the Legislature made clear that any amounts paid prior to that time need not be vacated, regardless of whether the sentence of the person on whom the costs were imposed is final.

Because section 6111 indicates a legislative intent to extend the ameliorative changes in the law regarding the imposition of administrative fees to individuals serving both final and nonfinal sentences, but only to the extent of relieving those individuals of the burden of any debt that remains unpaid on and after July 1, 2021, the *Estrada* rule does not apply, and Lopez-Vinck is not entitled to have the fee imposed pursuant to Government Code section 29550.1 vacated in its entirety as a result of the repeal of section 29550.1.

However, we do not agree with the People's contention that affirmance of the judgment as it stands is appropriate. Pursuant to the express terms of section 6111, subdivision (a), Lopez-Vinck is entitled to the vacatur of that portion of the criminal justice administration fee imposed pursuant to Government Code section 29550.1 that remains unpaid as of July 1, 2021, and to the modification of his judgment consistent with such vacatur. Section 6111, subdivision (a) provides not only that any costs imposed pursuant to the listed statutory provisions that remain unpaid on and after July 1, 2021 are "unenforceable and uncollectible," but also that "any portion of a judgment imposing those costs *shall be vacated*." (§ 6111, subd. (a), italics added.) Thus, by its express terms, section 6111 envisions that the referenced costs are to be vacated, and it makes the vacatur mandatory through its use of the word "shall." (See, e.g., *Mostafavi Law Group, APC v. Larry Rabineau, APC* (2021) 61 Cal.App.5th 614, 622 [noting that courts generally construe the word "shall" as mandatory].)[8] Although section 6111's reference to "those costs" is ambiguous, in that "those costs" could refer to the entirety of the fee imposed by the trial court, such that the vacating of "those

_____

[8]    We do not intend to suggest that an individual whose sentence is final must seek the vacatur of any unpaid fees from a court in order to obtain the ameliorative benefit of section 6111. By operation of law, any fees imposed pursuant to Sections 29550, 29550.1, 29550.2, and 29550.3 that remain unpaid as of July 1, 2021 are unenforceable and uncollectible. As a result, any individual whose sentence is final will not be required to pay the remaining balance of such fees, regardless of whether that remaining balance is formally vacated by a court. However, given the language of section 6111, a defendant whose judgment is on appeal and who requests the vacatur of any remaining unpaid fees is entitled to have vacated any portion of the fees imposed pursuant to any of the statutes identified in section 6111 that remain unpaid as of July 1, 2021, rather than having his sentence affirmed.

costs" would eliminate the fee in its entirety, we conclude that the statutory scheme supports interpreting the phrase "those costs" as referring only to that portion of fee imposed by the court that *remains unpaid* as of July 1, 2021. (See Assem. Bill No. 1869 (2019–2020 Reg. Sess.) § 2 [intent of the Legislature is to "eliminate all *outstanding debt* incurred as a result of the imposition of administrative fees" (italics added)].)[9] We therefore vacate any balance of the costs imposed by the court pursuant to Government Code section 29550.1 that remains unpaid as of July 1, 2021.

## IV.

## DISPOSITION

The portion of criminal justice administration fee imposed by the court pursuant to Government Code section 29550.1 that remains unpaid as of July 1, 2021 is vacated. The judgment is affirmed as so modified.

The matter is remanded to the trial court with directions to correct the March 7, 2019 minute order and the abstract of judgment to reflect the striking of the one-year prison prior enhancement. The court is further directed to amend the abstract of judgment to reflect the vacatur of any balance of the fee imposed pursuant to Government Code section 29550.1 that remains unpaid as of July 1, 2021. The court shall forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

---

[9] Lopez-Vinck appears to concede that he is entitled to the vacatur of only that portion of the fee that remains unpaid as of July 1, 2021, although he phrases his request for relief slightly differently: "Appellant . . . respectfully requests that this Court order the abstract of judgment amended to strike the fee and direct the trial court to vacate the portion of the judgment ordering collection of any unpaid debt related to that fee."

28

AARON, Acting P. J.

WE CONCUR:

IRION, J.

GUERRERO, J.